No. 57,791

In the Matter of the Petition of the CITY OF MORAN, KANSAS, the ALLEN COUNTY BANK & TRUST, Iola, Kansas, Trustee, and the IOLA STATE BANK, Iola, Kansas, Paying Agent, Requesting Instructions Regarding Trust.

(713 P.2d 451)

Opinion filed January 17, 1986.

*Kari S. Schmidt,* of Wichita, argued the cause and was on the briefs for appellant, Wichita Bank for Cooperatives.

*Frederick G. Apt, Jr.,* of Apt and Apt, of Iola, appeared for appellant, BROTE.

*Robert V. Talkington*, of Conderman and Talkington, of Iola, argued the cause and was on the brief for appellee, City of Moran.

The opinion of the court was delivered by

LOCKETT, J.: This case involves the respective rights of parties to personal property sold by a receiver. The City of Moran filed an action alleging that under a statutory lease-purchase agreement it held a superior interest in the sales proceeds, because the original equipment was purchased with money from industrial revenue bonds issued through the City. K.S.A. 12-1741. The Wichita Bank for Cooperatives claimed a perfected security interest in the same proceeds under the Uniform Commercial Code. The district court granted judgment for the City.

On August 1, 1973, the City of Moran, Kansas, (City) issued industrial revenue bonds in the amount of $225,000. The bonds were issued pursuant to K.S.A. 12-1740 *et seq.*, for the purpose of providing funds for the purchase of land and existing buildings, and to construct, furnish and equip the facility which was to be leased to The Farmers Cooperative Association (Cooperative).

The City pledged the facility and the net earnings of the Cooperative to the payment of the bonds, the interest and the premium. The principal and interest on the bonds were secured by a first lien on the real and personal property and the net revenues to be derived from the facility. The City entered a lease-purchase agreement dated August 1, 1973, with the City as the landlord and the Cooperative as the tenant. The City owned the facility under the lease-purchase agreement until the Cooperative exercised its right to purchase the facility.

Section 30 of the lease provided that the facility "shall consist of land, buildings and only such equipment and fixtures as may be necessary to render the Facility operable." To protect the interest of the bondholders, the lease provided that such items within the scope of Article 9 of the Uniform Commercial Code (UCC) would be covered by a financing agreement. The trustee was the Allen County State Bank, Iola, Kansas, and the paying agent was Iola State Bank, Iola, Kansas.

On September 10, 1973, the City filed a financing statement with the Secretary of State covering all equipment, machinery and fixtures now owned or later acquired by the Cooperative which constituted a part of the facility. A statement was also filed

on September 12, 1973, with the Allen County Office of the Register of Deeds.

On March 4, 1980, the Cooperative, in need of operating capital, delivered a promissory note in the amount of $300,000 to the Wichita Bank for Cooperatives (Bank). Subsequent notes from the Cooperative were executed to the Bank for loans totaling more than $1,174,572. The Cooperative executed security agreements with the Bank as collateral for the notes. On February 6, 1980, the Bank filed local and central financing statements covering all the equipment now owned or thereafter acquired or defined by Section 9-109(2) of the UCC, including equipment, fixtures, inventories, accounts and investments whether presently owned or thereafter acquired by the Cooperative.

On March 7, 1980, the City and Allen County Bank and Trust filed their second financing statements with the identical language used by the City in its 1973 financing statements.

Three separate actions were filed by various parties. The pleadings and claims of the parties in the three actions are simplified for the sake of clarity. On March 24, 1983, the first action was filed when the Kansas State Grain Inspection Department filed a verified petition for appointment of a special receiver for the Cooperative, alleging that a grain shortage existed at the warehouse facility and that the Cooperative was insolvent. At a hearing on the petition, the court appointed a grain receiver and permitted the warehouse bonding company to intervene.

On March 31, 1983, a second action was begun when the Bank filed a petition in the district court to foreclose its mortgage and security interests in the Cooperative. Notice was given to all creditors to file claims against the Cooperative. The Bank filed its claim in the amount of $1,174,572 plus interest for C stock subscription obligations and the reasonable costs of collection.

At a hearing on April 28, 1983, the court addressed several issues involving prospective intervenors, attorney fees and certain creditors' claims. At the hearing, there was a discussion concerning bids which had been received for purchase of the Cooperative facility. BROTE, a partnership, had bid on the facility, but subsequently reduced its bid due to a dispute as to whether certain equipment belonged to the City by virtue of its bond issue for the Cooperative. At the hearing, the grain receiver made an oral motion to abandon to the City any right, title or

interest of the Cooperative in the lease-purchase agreement as of May 1, 1983. The order to abandon was filed on May 19, 1983.

On September 28, 1983, a third action was commenced when the City filed a Petition for Instructions requesting that the court make a determination as to ownership of certain equipment because a dispute existed between the City and the Bank as to what equipment was subject to the bond ordinance and lease-purchase agreement. The City also alleged that the proceeds of the property which had been sold to BROTE were improperly forwarded by the receiver to the Bank pursuant to the Bank's security agreements with the Cooperative. The City's petition stated that all of the proceeds should have gone to the City to satisfy bondholders.

The Bank was served with a summons on the petition for instructions. The Bank filed a motion to dismiss due to insufficiency of process. When the court did not address the Bank's motion, the Bank filed an answer alleging that the City's petition failed to state a claim on which relief could be granted, laches on the part of the City, and a counterclaim for amounts owed to the Bank.

The original receivership and foreclosure actions were settled among the parties on September 28, 1984. In order to release the receiver, the Bank signed an agreement whereby it agreed to indemnify the receiver in the event that the petition for instructions matter developed into a lawsuit for conversion.

On December 12, 1984, the district court entered judgment in favor of the City on its petition for instructions. The court ruled that the City held title to the disputed equipment, except for a 1979 Chevrolet ¾ ton truck, which had been titled in the Cooperative. The court found that the Cooperative had granted a security interest in the truck to the Bank, because title to the truck had been registered to the Cooperative. The court also found that the Kansas industrial revenue bond statutes authorize the City to enter into a lease or lease-purchase agreement, not an installment sales contract covered by the UCC. The Bank appeals those rulings.

The Bank argues that a "petition for instructions" is an administrative pleading used under our previous probate code. It contends that the statutory authority for such a petition was repealed in 1977, and, therefore, the City should have brought

this action as a declaratory judgment. The City argues that a petition for instructions is proper despite the 1977 changes in the court system.

A petition for instructions was a procedure under our prior probate code available for administrators and executors who wished to ask a court having jurisdiction for advice to enable them to carry out their duties when they were in doubt as to the extent of their powers and duties relating to the administration of an estate. It was not an adversarial proceeding. With the repeal of K.S.A. 59-301 (Corrick) in 1976, there is no longer any statutory authority for such a proceeding.

Under our present civil code this action should have been brought as a declaratory judgment rather than as a petition for instructions. K.S.A. 60-102 provides, however, that the code of civil procedure should be liberally construed to provide for a just, speedy and inexpensive determination of every action. The district court treated the petition for instructions as a request for declaratory judgment without requiring that it be refiled. The Bank contends, however, that the petition was inadequate and that it was denied the right of due process.

The meaning of procedural due process is that parties whose rights are to be affected are entitled to be heard, and, in order that they may enjoy that right, they must first be notified. It is equally fundamental that the right to notice and the opportunity to be heard must be granted at a meaningful time and in a meaningful manner. *Dedeke v. Rural Water Dist. No. 5*, 229 Kan. 242, 623 P.2d 1324 (1981).

The Bank was aware of the proceedings despite the incorrect form used. The Bank filed a responsive pleading to the petition and appeared and participated in the fact-finding hearing. Under the circumstances, the Bank was notified; it took advantage of the opportunity to be heard and received a meaningful hearing. The Bank's claim that it did not receive due process is without merit.

The Bank argues that the trial court's procedure deprived it of the right to trial by jury as provided under K.S.A. 60-238 and 60-239.

The right to a jury trial in a civil proceeding in Kansas is not absolute. Constitutional and statutory provisions establish general principles to be followed by the courts in determining

whether one is entitled to a jury trial. The right to a jury trial refers to that right as it existed under the common law. At common law and under the Kansas constitution, a party is not entitled to a trial by jury as a matter of right in a suit in equity. *Waggener v. Seever Systems, Inc.*, 233 Kan. 517, 664 P.2d 813 (1983).

The procedure for obtaining a declaratory judgment (K.S.A. 60-257) provides for the right of a jury trial in the same manner as provided by K.S.A. 60-238 and 60-239. Therefore, the right to a jury trial in an action for a declaratory judgment is not absolute. It must first be determined whether the declaratory judgment action is equitable in nature or one at common law. In determining whether the action for a declaratory judgment is one in equity, the test is whether the essential nature of the action is grounded on equitable rights and is one in which equitable relief is sought. *Karnes Enterprises, Inc. v. Quan*, 221 Kan. 596, 561 P.2d 825 (1977). In the present case, the Bank was requesting that the court determine the priority of security liens. The City was claiming that the legislature had precluded the lease-purchase agreement from the Code. The facts were not disputed. Therefore, the resolution of either question did not entitle the parties to a jury trial at common law. The Bank was not denied its right to a jury trial.

The Bank claims that the equipment was never intended to be purchased with bond funds and that there was insufficient evidence to support a finding that the equipment was purchased with bond funds.

In his memorandum decision, the trial judge carefully set out the testimony of the witnesses. The witnesses testified that the equipment was either originally purchased with the bond money or bought as a replacement for the original equipment. Reviewing all the evidence in the light most favorable to the City, there was substantial evidence to support the trial court's findings that the property in dispute was purchased with industrial revenue bond funds. The Bank's charge of insufficient evidence is without merit.

The Bank contends that the lease-purchase agreement between the City and the Cooperative was actually an installment sale covered by the filing and perfection requirements of the UCC. It claims that industrial revenue bond statutes intended

that such transactions would be covered by Article 9 of the UCC and that the district court erred in construing them to exclude the lease-purchase agreement from Article 9.

The UCC applies to security interests created by contract, including pledge, assignment, chattel mortgage, chattel trust, trust deed, factor's lien, equipment trust, conditional sale, trust receipt, other lien or title retention contract and lease or consignment intended as security. Whether a lease is intended as security is to be determined by the facts of each case. The inclusion of an option to purchase does not of itself make the lease one intended for security. However, an agreement that, upon compliance with the terms of the lease, the lessee shall become or has the option to become the owner of the property for no additional consideration or for a nominal consideration does make the lease one intended for security. K.S.A. 84-1-201(37).

The Bank claims when the City filed its first financing statement in September 1973, its interest in the equipment was protected for five years under the UCC. Prior to the expiration of the five year period, the City failed to file a continuation statement and the effectiveness of its original financing statement lapsed. K.S.A. 84-9-403. When the Bank filed its financial statement on February 6, 1980, covering the equipment, the City was no longer protected by its original financing statement. The City's subsequent filing of a second financing statement was after the Bank's filing. Therefore, the Bank contends it had priority at time of filing. K.S.A. 84-9-312(5)(a) since amended. The Bank's reasoning is correct if the lease-purchase agreement is subject to the UCC.

Even though a transaction falls within the general scope of K.S.A. 84-9-102 of the UCC, it still may be excluded from Article9 as a matter of public policy by the legislature. K.S.A. 84-9-104 includes a list of express exclusions from Article 9. It does not specifically exclude the type of transaction involved in the present case. It is therefore necessary to look at the industrial revenue bond statutes, K.S.A. 12-1740 *et seq.*, to determine whether the legislature intended that such transactions should be excluded.

Generally, in construing a statute, words and phrases should be construed according to the context and approved usage of the language, and words in common use are to be given their natural

and ordinary meaning. *Jackson v. City of Kansas City,* 235 Kan. 278, 680 P.2d 877 (1984). In determining legislative intent, courts are not bound to an examination of the language alone but may properly look into the causes which impel the statute's adoption, the objective sought to be attained, the statute's historical background and the effect the statute may have under the various constructions suggested. *State, ex rel., v. City of Overland Park,* 215 Kan. 700, 527 P.2d 1340 (1974).

One of the stated purposes of industrial revenue bonds under the Economic Development Revenue Bond Act (K.S.A. 12-1740 *et seq.*) is to develop the economic prosperity of the state by providing greater employment opportunities and developing industry. The Act states that the term "facility" shall include the site and the necessary site preparation, structures, easements, rights-of-way and appurtenances necessary and convenient to the particular type of facilities being financed. K.S.A. 12-1740.

The Act authorizes cities and counties to issue revenue bonds to pay all or a part of the cost of purchasing, acquiring, constructing, reconstructing, improving, equipping, furnishing, repairing, enlarging or remodeling the facilities. A city has the power by ordinance to enter into leases or lease-purchase agreements for the facilities. K.S.A. 12-1741.

A city or county can neither contract nor incur any obligation for the payment of the revenue bonds. The bonds cannot be general obligation bonds of the city or county, nor payable by taxation. The revenue bonds must be paid from the rentals received from the facilities. K.S.A. 12-1743. A city by ordinance or a county by resolution may pledge the facility and the net earnings from the facility to pay the bondholders. K.S.A. 12-1744. The lease or lease-purchase agreement of the facility may provide that payment of or security for the revenue bonds may include the land, the buildings, the furnishings and the equipment used by the facility. K.S.A. 12-1747.

The Bank states that to protect creditors from fraudulent transactions by the lessee having possession of the lessor's property, the lease-purchase agreement entered into by the City and the Cooperative must be considered as an installment contract subject to the UCC.

In the Act, the legislature described the transaction as a "lease-purchase agreement." The industrial revenue bond stat-

utes were enacted prior to the enactment of the UCC. The legislature, therefore, at the time the UCC was enacted, could have included the industrial revenue bond lease-purchase agreements as a security interest subject to the filing requirements of the UCC. The legislature, however, did not choose to specifically include the lease-purchase agreements when it enacted the UCC.

Under the Act, a lease-purchase agreement of a facility which includes realty, furnishings and equipment is to be viewed as a single transaction and as one created by the legislature. Obviously, there were policy reasons the legislature intended that the transaction be characterized as a lease-purchase agreement and not subject to Article 9 of the UCC. To do otherwise would certainly discourage bondholders who would be dependent upon the city or the county to protect their interest by filing a financing statement.

The recording of the deed and the lease-purchase agreement of the realty solves any problems created by the lessee having possession of the realty. Unfortunately, a lease or lease-purchase agreement which allows the lessee to have possession of personal property, i.e., the equipment or furnishings, fails to give notice to creditors or innocent purchasers that the lessee having possession is not the owner of the equipment or furnishings. The mere fact that the lessor has entrusted the lessee with possession of the lessor's property does not preclude the lessor from later asserting his title. Generally, one entrusted with property cannot pledge the property as security for a debt or sell the property and convey title unless he lawfully represents the owner. *Jordan v. Kancel*, 188 Kan. 292, 361 P.2d 894 (1961); K.S.A. 84-2-403. Under the lease-purchase agreement, the City neither parted with its title to the equipment nor clothed the Cooperative with the apparent authority to pledge it as security for the loan from the Bank. The Bank acquired no superior interest in the equipment to which the City held title. Though the pickup truck was purchased with bond money, title to the truck was registered in the name of the Cooperative. The City clothed the Cooperative with apparent authority to pledge the truck as security for the loan obtained from the Bank. The Bank's security interest in the truck is superior to that of the City.

Where a city or county, under the Economic Development

Revenue Bond Act, owns a facility which includes the land, furnishings and equipment, and leases it for a period of years at a stipulated rental under a lease-purchase agreement which contains a stipulation that the lessee shall have the right, during or at the expiration of the agreement, to purchase the facility, if the lessee so elects, at a fixed price, there is no complete sale. The lessee does not acquire an estate beyond the lease interest until he has elected to accept the offer and has paid or tendered the purchase price set out in the lease-purchase agreement. A lease-purchase agreement created under the Economic Development Revenue Bond Act is not subject to the filing requirements of the UCC.

Affirmed.