DELPHI AUTOMOTIVE SYSTEMS,
LLC, Appellant

v.

CAPITAL COMMUNITY ECONOM-
IC/INDUSTRIAL DEVELOPMENT
CORPORATION, INC., Appellee.

No. 2012–SC–000249–DG.

Supreme Court of Kentucky.

June 19, 2014.

Virginia Hamilton Snell, Daniel Ernest Hitchcock, Counsel for Appellant.

Robert W. Kellerman, Sarah Jackson Bishop, Counsel for Appellee.

Opinion of the Court by Justice ABRAMSON.

In August 2008, Certified Tool and Manufacturing Corporation announced it was going out of business, precipitating a default on a promissory note and security agreement which the company had with Appellant Delphi Automotive Systems, LLC. A few months later, Delphi filed a declaratory judgment action in which it asserted that its perfected security interest in Certified Tool's equipment, including specifically a Komatsu press, was superior to the unperfected security interest claimed by Appellee Capital Community Economic/Industrial Development Corporation, Inc., an industrial development entity established pursuant to Kentucky Revised Statutes (KRS) 154.50–301–.50–346. Capital Development countered that its interest in the Komatsu press was not a security interest but rather an ownership interest, with the press being simply leased to Certified Tool. Alternatively, Capital Development maintained that even if its interest in the Komatsu press was a security interest, Article 9 of the Uniform Commercial Code is not applicable due to one or more of the following: (1) limitations on the scope of Article 9 set forth in KRS 355.9–109(4)(q) regarding governmental units; (2) the KRS 355.9–109(3) exemption of transactions controlled by other statutes; and (3) public policy in Kentucky relevant to economic development. Having concluded that the Court of Appeals erred in holding that Capital Development's security interest in the Komatsu press was not subject to the provi-

sions of Article 9, we reverse and remand this matter to the circuit court.

### RELEVANT FACTS

Certified Tool is a manufacturer formerly located in Franklin County, Kentucky. In early 2001, Certified Tool received a Community Block Development Grant from the Commonwealth of Kentucky in the sum of $335,000 through Capital Community, a non-profit corporation established under KRS Chapter 154.50 as a joint city/county effort for industrial development in Frankfort and Franklin County. The grant included $320,000 earmarked for equipment. In March 2001, Certified Tool purchased the Komatsu press directly from Komatsu America Industries LLC for $519,000. On April 16, 2001, Capital Community and Certified Tool entered into an agreement identified as a "Lease" covering equipment owned by Certified Tool. The agreement required monthly payments of $3,394.10 for 84 months and provided that, upon completion of all payments, Certified Tool would become the owner of the subject equipment, including the Komatsu press.

In May, 2008 Delphi extended credit of $250,000 on an as-needed basis to Certified Tool. The promissory note reflecting that transaction was later amended to increase the line of credit to $275,000. In conjunction with this loan, Delphi obtained a security agreement that granted it a continuing interest in all of Certified Tool's then-owned and later-acquired property, including the Komatsu press. The First Amended Promissory Note and Security Agreement are the documents upon which Delphi's claims are based. Delphi perfected its security interest by filing UCC financing statements with both the Kentucky and Illinois Secretaries of State on June 16, 2008.

Certified Tool's August 2008 announcement that it would cease business constituted a default under its First Amended Promissory Note and Security Agreement, prompting Delphi to exercise its right to accelerate all payments due on the note. Delphi apparently also reached out to another of Certified Tool's creditors, Working Capital Solutions, which had a perfected security interest in the property and assets of Certified Tool superior to that of Delphi. In December 2008, Delphi acquired all of Working Capital Solutions' rights, title and interest in Certified Tool's property and assets.

Delphi filed the aforementioned declaratory judgment action in August 2009, seeking to enforce its security interest. By agreement of the parties, the Komatsu press was liquidated and the proceeds, $185,370, were deposited into court pending resolution of the dispute between Delphi and Capital Community, both of which claim the right to the full proceeds. Following cross-motions for summary judgment, the Franklin Circuit Court granted summary judgment in favor of Capital Community. Although the court concluded that the agreement between Capital Community and Certified Tool was a security interest rather than a lease, it found Capital Community exempt from the Article 9 security interest perfection requirements as a matter of public policy reflected in Kentucky's economic development statutes.

On appeal, the Court of Appeals also concluded that the agreement was a security interest rather than a lease, but did not reach the public policy point relied upon by the trial court, finding instead that KRS 355.9–109(4)(q) applied to exempt the transaction from the filing requirements of Article 9. The Court of Appeals concluded that the exemption in KRS 355.9–109(4)(q) applies to a transaction in-

volving assets where the government or a governmental unit was either the borrower or the creditor. With that construction of the statute, the appellate panel held that Capital Community was not required to perfect its security interest by filing a financing statement and its 2001 security interest was superior to Delphi's subsequent, perfected 2008 security interest. As noted, we conclude the Court of Appeals erred in its analysis and, given there is no other basis for excusing Capital Community from complying with the filing requirements of Article 9, including the public policy exception invoked by the circuit court, we reverse and remand for entry of judgment in favor of Delphi.

## *ANALYSIS*

### I. The Lower Courts Correctly Concluded that the Capital Community/Certified Tool Agreement Created a Security Interest.

■ Capital Community first argues that Article 9, governing secured transactions, does not apply in this case because Capital Community's interest in the Komatsu press is not a security interest but rather an ownership interest. Although the April 16, 2001 agreement between Capital Community and Certified Tool is identified on the first page as a "Lease," as both lower courts observed, this label is not dispositive. KRS 355.1–203, entitled "Lease distinguished from security interest," provides in relevant part:

(1) Whether a transaction in the form of a lease creates a lease or security interest is determined by the facts of each case.

(2) A transaction in the form of a lease creates a security interest if the consideration that the lessee is to pay the lessor for the right to possession and use of the goods is an obligation for the term of the lease and is not subject to termination by the lessee, and:

(a) The original term of the lease is equal to or greater than the remaining economic life of the goods;

(b) The lessee is bound to renew the lease for the remaining economic life of the goods or is bound to become the owner of the goods;

(c) The lessee has an option to renew the lease for the remaining economic life of the goods for no additional consideration or for nominal additional consideration upon compliance with the lease agreement; or

(d) The lessee has an option to become the owner of the goods for no additional consideration or for nominal additional consideration upon compliance with the lease agreement.

Applying KRS 355.1–203(2) to the parties' agreement,[1] we look first to whether the consideration that Certified Tool was to pay Capital Community for the right to possession and use of the Komatsu press was an obligation for the term of the 84–month lease and whether Certified Tool was not allowed to terminate the lease. In fact, Certified Tool was *not* allowed to terminate the lease and it agreed in paragraph 3 to an "absolute and unconditional" obligation to pay rent for the duration of the 84 months. Both of these threshold

---

**1.** As the Court of Appeals noted, at the time of the parties' agreement the provision applicable to the distinction between a lease and a security agreement was codified at KRS 355.1–201(37). That provision was identical in all material respects to the current KRS 355.1–203.

factors being present, the next issue is whether any one of the additional factors in 355.1–203(2)(a) through (d) is present. As both lower courts correctly concluded, the subject agreement satisfies both subsection (b) and subsection (d). Under paragraph 7 of the agreement, Certified Tool was bound to become the owner of the equipment, including the Komatsu press, upon expiration of the term of the document, rendering KRS 355.1–203(2)(b) applicable. Additionally, Certified Tool had the right to become the owner "for no additional consideration ... upon compliance with the lease agreement." KRS 355.1–203(2)(d). Consistent with the rulings of both lower courts, we can readily dismiss the argument that the agreement was a lease rather than a security agreement. Under a plain reading of KRS 355.1–203 and the agreement, Capital Community had a security interest in the Komatsu press so we turn next to whether there is any basis for concluding that Kentucky's Article 9 does not apply to that interest.

## II. Article 9 Governs the Creation and Perfection of Security Interests Generally Including the Interest Held by Capital Community.

KRS 355.9–310(1) states that except as provided in subsection (2) of that statute and KRS 355.9–312(2), "a financing statement must be filed to perfect all security interests...." None of the identified exceptions applies to the facts of this case, so it is readily apparent that Delphi, having properly filed a financing statement, has a perfected security interest while Capital Community, having not filed a financing statement, has an unperfected security interest. The parties do not dispute these facts nor do they dispute that under KRS 355.9–322(*l*)(b) a perfected security inter-

est takes priority over an unperfected interest. If this were the extent of the analysis, Delphi would be entitled to the proceeds from the sale of the Komatsu press but, of course, the parties' dispute requires us to back up and consider whether Article 9 even applies in the first instance to the particular transaction between Capital Community and Certified Tool. The trial court and the Court of Appeals found it did not, albeit for totally different reasons.

■ Before turning to the specific statutory language at issue, we note that the proper interpretation of Kentucky statutes is an issue of law which we address *de novo.* *Shawnee Telecom Resources, Inc. v. Brown,* 354 S.W.3d 542, 551 (Ky.2011). Our primary goal is to discern the intent of the General Assembly, and we discern that intent, if at all possible, from the plain language used. Where a statute is ambiguous, we resort to legislative history, canons of statutory construction and, in the case of uniform statutes such as the Uniform Commercial Code, interpretations by other courts. *Id.* In this case, we also have the benefit of Official Comments to the UCC provisions, Comments which the legislature has indicated "represent the express legislative intent of the General Assembly and shall be used as a guide for interpretation." KRS 355.1–103(3).

### A. KRS 355.9–109(4)(q) Does Not Exclude This Transaction from Article 9.

■ KRS 355.9–109, entitled "Scope," contains a laundry list of transactions and circumstances in which Article 9 does not apply. The Court of Appeals focused on KRS 355.9–109(4)(q), the very last type of excepted transaction in the statute referred to as "[a] public-finance transaction or a transfer by a government or governmental unit."[2] Capital Community, as

---

**2.** A "public-finance transaction" is defined in KRS 355.9–102(1)(bo) and involves the issu-

both parties concede, qualifies as a "governmental unit" under KRS 355.9–102(1)(as),[3] but has there been a transfer "by" Capital Community? The Court of Appeals answered affirmatively by noting that Capital Community had transferred or "issued" an asset, the Komatsu press, to Certified Tool. While "issue" is a verb not found in the statute, it found its way into the analysis based on the following commentary to House Bill 649, 2002 Ky. Acts 550, the emergency legislation by which the 2002 Kentucky General Assembly adopted subsection (4)(q):

> Whereas Kentucky state and local government issuers of debt are now subject to the perfection and filing requirements of the revised Article 9 of the Uniform Commercial Code and on July 1, 2002, will be required to comply with these requirements with respect to outstanding debt obligations, resulting in an increase in the burdens and costs of borrowing for these state and local governmental entities, an emergency is declared to exist, and this Act takes effect upon its passage and approval by the Governor or upon its otherwise becoming a law.

The foregoing reflects concern about governmental "issuers of debt," their "outstanding debt obligations" and the resulting "increase in the burdens and costs of borrowing for these state and local governmental entities." The commentary clearly speaks to those circumstances where the governmental entity is the borrower/ debtor not transactions where the entity loans funds and takes a security interest.

Moreover, looking at the history of Kentucky's version of Article 9 underscores that KRS 355.9–109(4)(q) addresses governmental borrowers. In 2000, the Kentucky General Assembly revised Article 9 with an effective date of July 1, 2001. 2000 Ky. Acts 1296–1368. Prior to that time, former KRS 355.9–104, entitled "Transactions excluded from article," included subsection (5), which identified one form of excluded transaction as "a transfer by a government or governmental subdivision or agency." This subsection, on which the current KRS 355.9–109(4)(q) is clearly patterned, was universally understood to be applicable only to government debtors/borrowers. In fact, the Official Comment to current section 9–109 states:

> **9. Governmental Debtors.** *Former Section 9–104(e) excluded transfers by governmental debtors.* It has been revised and replaced by the exclusions in new paragraphs (2) and (3) of subsection (c). These paragraphs reflect the view that Article 9 should apply to security interests created by a state, foreign country, or a "governmental unit" (defined in Section 9–102) of either except to the extent that another statute governs the issue in question. Under paragraph (2), this Article defers to all statutes of the forum state. (A forum cannot determine whether it should consult the choice of law rules in the forum's UCC unless it first determines that its UCC applies to the transaction before it.) Paragraph (3) defers to statutes of another state or a foreign country only to the extent that those statutes contain rules applicable specifi-

---

ance of debt securities by a state or governmental unit. It has no application here.

**3.** KRS 355.9–102(1)(as) provides:
"Governmental unit" means a subdivision, agency, department, county, parish, municipality, or other unit of the government of the United States, a State, or a foreign

country. The term includes an organization having a separate corporate existence if the organization is eligible to issue debt on which interest is exempt from income taxation under the laws of the United States;

cally to security interests created by the governmental unit in question.

(emphasis supplied). Given this background, it seems clear that the Court of Appeals erred in concluding that a transaction in which a governmental entity is an "issuer of assets" and takes a security interest is exempted from Kentucky's Article 9.

Finally, as the circuit court noted in this case, courts in other states have consistently held that the transactions exempted by this, or a virtually identical, provision are those involving the government as debtor/borrower. *See, e.g., Farmers & Merchants Nat'l Bank v. Fairview State Bank,* 766 P.2d 330, 332 (Okla.1988) ("Because no government borrowing occurred, the provision is clearly inapplicable"); *Bowlen v. Fed. Deposit Ins. Corp.,* 815 P.2d 1013, 1015 (Colo.App.1991) ("The governmental subdivision or agency exclusion of § 4–9–104(e) [comparable to our current KRS 355.9–109(4)(q) ] covers only transactions in which the government is a debtor/borrower."); *The Peoples Bank And Trust Co. v. Applewhite (In re 20th Century Enterprises, Inc.),* 152 B.R. 119, 123 (Bankr.N.D.Miss.1992) (This section "excludes transactions ... when the governmental agency is the debtor or borrower, not when it is the secured creditor."). By contrast, neither the Court of Appeals nor Capital Community has identified a case in which a court has held that current section 9–109(4)(q) (however, it may be numbered) is applicable when the government/governmental unit is a lender/secured party.

There is, thus, no sound basis for concluding that transactions, such as the one at issue in this case, involving the governmental unit as a secured creditor are excluded from Article 9 by virtue of KRS 355.9–109(4)(q). Rather, as the legislative history, Official Comment and precedent from other jurisdictions establish, the transactions excluded by the language "a transfer by a government or governmental unit" are those in which the government/governmental unit borrows money and transfers a security interest.

**B. KRS 355.9–109(3)(b) Does Not Apply Because There is No Kentucky Statute Expressly Governing the Security Interest Taken by Capital Community.**

 KRS 355.9–109(3)(b) states that Article 9 does not apply to the extent that "[a]nother statute of this Commonwealth expressly governs the creation, perfection, priority, or enforcement of a security interest created by this Commonwealth or a governmental unit of this Commonwealth." As noted above, the Official Comment to section 9–109 entitled "Governmental Debtors" specifically indicates that this is one of two subsections that replaced former KRS 355.9–104(e). While arguably it applies only to those transactions where the government/governmental entity is the debtor, it is not necessary to decide that issue because it is abundantly clear that Kentucky has no statute whatsoever that "expressly governs" security interests created by the government or governmental entities. Capital Community tries to base a KRS 355.9–109(3)(b) exception on the Local Industrial Development Authority Act, KRS 154.50–301 to .50–346, but a fair reading of that statute does not sustain that argument.

First, Capital Community contends that it only has statutory authority to "lease" equipment and therefore could not have entered into a secured transaction. As Delphi counters, KRS 154.50–320(1)(d) expressly allows a local industrial development authority to "lease, sell, or convey any or all" industrial sites, which includes not only the land and improvements but also all fixtures and equipment. There is nothing which prohibits a secured transaction and certainly nothing that "expressly

governs" a security interest taken by a local industrial development authority like Capital Community. KRS 355.9–109(3)(b) provides an exemption from Article 9 only when another statute "expressly governs." For the same reason, Capital Community's second argument regarding a section 9–109(3)(b) exemption—KRS Chapter 154.50 "effectively governs the creation of such security interests . . . by failing to authorize them"—must also fail. Silence regarding the treatment of a local industrial development authority's secured interests cannot possibly qualify as a statute "expressly" governing such interests. In sum, KRS 355.109(3)(b) has no application here because there is no Kentucky statute that expressly governs security interests created by the Commonwealth or one of its governmental units.

## C. Public Policy Cannot Exempt Capital Community's Security Interest from Article 9.

■ The final contention advanced by Capital Community, that public policy favors excusing governmental units from the security interest perfection requirements of Article 9, simply has no basis in our law. In KRS 355.9–109(3)(b), as just discussed, Article 9 singles out security interests involving governments and governmental units for exemption if a statute "expressly governs" and there is no such statute in Kentucky. The other transactions and circumstances which are outside the scope of Article 9, KRS 355.9–109, do not reference public policy considerations. The trial court based its public policy determination on one Kansas case, a case which is not only factually distinguishable but which offers no sound reason for ignoring Kentucky statutes.

In *In re City of Moran*, 238 Kan. 513, 713 P.2d 451 (1986), a grain cooperative had a lease-purchase agreement with the City for land, buildings and equipment. The City first issued revenue bonds to obtain the funds necessary for the land/equipment purchase and then leased all of the property to the cooperative. Interestingly, the City actually filed Article 9 financing statements on the equipment, equipment which subsequently became the focus of a dispute between the City and a bank that loaned funds to the cooperative some years later. Because the City's financing statement expired under Kansas law after five years and the City failed to refile in a timely manner, the Bank's perfected security interest, acquired some seven years after the initial transaction between the cooperative and the City, was superior to the City's then-unperfected security interest if Article 9 applied. The Kansas Supreme Court concluded that because the original transaction between the City and the cooperative was deemed a "lease-purchase" by the parties and was authorized by revenue bond statutes that predated the state's adoption of the Uniform Commercial Code, the provisions of Article 9 did not apply. The City's interest was given priority, despite its failure to comply with Article 9, in part because the court concluded that holding otherwise "would certainly discourage bondholders who would be dependent upon the city or the county to protect their interest by filing a financing statement." 713 P.2d at 457.

We find nothing in *In re Moran* that persuades us to ignore the clear directives of KRS 355.9–101 to .9–809. There is nothing inherently wrong in requiring a government or governmental unit which takes a security interest in equipment to comply with Article 9 by filing a financing statement as other creditors do. If our General Assembly thought that the government or a governmental unit, when occupying the role of a secured creditor, should have special status, the General Assembly could

have legislated appropriately as it has done, for example, with respect to ad valorem tax liens. *See* KRS 134.420(3) (such liens have priority "over any other obligation or liability"). Clearly, the General Assembly has not singled out governmental entities such as Capital Community for special treatment when it is a secured creditor so, like other creditors, it must comply with Article 9 in perfecting a security interest.

### CONCLUSION

The circuit court and the Court of Appeals erred in concluding that Capital Community was entitled to special deference with respect to its security interest in the Komatsu press. Neither KRS 355.9–109(4)(q), KRS 355.9–109(3), nor general public policy provides a basis for excusing Capital Community's failure to comply with Article 9 of our Uniform Commercial Code regarding security interests and the resulting order of priority. Delphi's perfected security interest in the Komatsu press prevails over Capital Community's unperfected security interest. Accordingly, we reverse the Court of Appeals' opinion and remand this case to the circuit court for entry of judgment in favor of Delphi Automotive Systems, LLC.

MINTON, C.J.; CUNNINGHAM, NOBLE, SCOTT, and VENTERS, JJ., concur. KELLER, J., not sitting.